ORDERED UNSEALED on **09/14/2026** **s/ melodyqu**

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

**ARREST ON OUT-OF-DISTRICT OFFENSE**

CASE NUMBER: 26mj5413

The person charged as Anthony Rea now appears before this United States District Court for an initial appearance as a result of the following charges having been filed in the United States District Court for the District of Connecticut with: Possession with Intent to Distribute and Distribution of Fentanyl, in violation of 21 U.S.C. Section(s) 841 (a)(I), 841 (b)(I)(A)(vi) and 841 (b )(1 )(C).

The charging documents and warrant for the arrest of the defendant which was issued by the above United States District Court are attached hereto.

I hereby swear under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

DATED: 09/14/2026

Daniel M. Perez
Special Agent
Federal Bureau of Investigation

Reviewed and Approved

Dated: 9/14/2026

LORAND MCCRUON
NAME
Special Assistant United States Attorney

26mj5413

JUL 15 2026 PM1:20
FILED-USDC-CT-HARTFORD

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

GRAND JURY H-25-1

UNITED STATES OF AMERICA

v.

ANTHONY REA

CRIMINAL NO. 3:26CR140 (SVH)(BMS)

VIOLATIONS:

21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(vi) and 841(b)(1)(C) (Possession with Intent to Distribute and Distribution of Fentanyl)

18 U.S.C. § 2 (Aiding and Abetting)

INDICTMENT

The Grand Jury charges:

COUNT ONE
(Possession with Intent to Distribute and Distribution of Fentanyl)

1. On or about October 17, 2025, in the District of Connecticut and elsewhere, the defendant ANTHONY REA, did knowingly and intentionally possess with intent to distribute, and did distribute, a mixture and substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide ("fentanyl"), a Schedule II controlled substance.

In violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C).

COUNT TWO
(Possession with Intent to Distribute and Distribution of Fentanyl)

2. On or about December 3, 2025, in the District of Connecticut and elsewhere, the defendant ANTHONY REA, did knowingly and intentionally possess with intent to distribute, and did distribute, a mixture and substance containing a detectable amount of fentanyl, a Schedule II controlled substance.

In violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C).

COUNT THREE
(Possession with Intent to Distribute and Distribution of Fentanyl)

3. On or about January 28, 2026, in the District of Connecticut and elsewhere, the defendant ANTHONY REA, did knowingly and intentionally possess with intent to distribute, and did distribute, a mixture and substance containing a detectable amount of fentanyl, a Schedule II controlled substance.

In violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C).

COUNT FOUR
(Possession with Intent to Distribute and Distribution of Fentanyl)

4. On or about February 6, 2026, in the District of Connecticut and elsewhere, the defendant ANTHONY REA, did knowingly and intentionally possess with intent to distribute, and did distribute, a mixture and substance containing a detectable amount of fentanyl, a Schedule II controlled substance.

In violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C).

COUNT FIVE
(Possession with Intent to Distribute and Distribution of Fentanyl)

5. On or about February 19, 2026, in the District of Connecticut and elsewhere, the defendant ANTHONY REA, did knowingly and intentionally possess with intent to distribute, and did distribute, a mixture and substance containing a detectable amount of fentanyl, a Schedule II controlled substance.

In violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C).

COUNT SIX
(Possession with Intent to Distribute and Distribution of Fentanyl)

6. On or about March 23, 2026, in the District of Connecticut and elsewhere, the defendant ANTHONY REA, did knowingly and intentionally possess with intent to distribute, and

did distribute, a mixture and substance containing a detectable amount of fentanyl, a Schedule II controlled substance.

In violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C).

COUNT SEVEN
(Possession with Intent to Distribute and Distribution of Fentanyl)

7. On or about May 7, 2026, in the District of Connecticut and elsewhere, the defendant ANTHONY REA, and others known and unknown to the Grand Jury, did knowingly and intentionally possess with intent to distribute, and did distribute, 400 grams or more of a mixture and substance containing a detectable amount of fentanyl, a Schedule II controlled substance.

In violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(vi), and Title 18, United States Code, Section 2.

FORFEITURE ALLEGATION
(Controlled Substance Offenses)

8. Upon conviction of one or more of the controlled substance offenses alleged in Counts One through Seven of this Indictment, the defendant ANTHONY REA shall forfeit to the United States, pursuant to Title 21, United States Code, Section 853, all right, title, and interest in any property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of the violations of Title 21, United States Code, Sections 841, and any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, the violations.

9. If any of the above-described forfeitable property, as a result of any act or omission of the defendant, cannot be located upon the exercise of due diligence, has been transferred, sold to, or deposited with a third party, has been placed beyond the jurisdiction of the court, has been substantially diminished in value, or has been commingled with other property that cannot be

divided without difficulty, it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

All in accordance with Title 21, United States Code, Sections 853 and 881, and Rule 32.2(a) of the Federal Rules of Criminal Procedure.

A TRUE BILL

[redacted]

FOREPERSON

UNITED STATES OF AMERICA

DAVID X. SULLIVAN
UNITED STATES ATTORNEY

NATASHA FREISMUTH
ASSISTANT UNITED STATES ATTORNEY

26mj5413

ORDERED UNSEALED on 09/14/2026 s/ melodyqu

SEALED

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

Plaintiff,

v.

[redacted] (1),
TRAVIS FAIRCLOTH (2),
DIEGO LA MADRID (3),
LEONARDO MONTELEONE (4),
ANDREW REVA (5),
GARRET HUTTER (6),
RENEE TRUJILLO (7),
ROBERT CLARK (8),
JOSEPH EGAN (9),
NICOLE LINES (10),
JEREMY JARRELL (11),
ERIKA PRICE (12),
STAN SZUMILAS (13),
CHRISTOPHER CURLL (14),
[redacted] (15),

Defendants.

Case No.: 26mj5181

COMPLAINT FOR VIOLATION OF

Title 21, U.S.C., Secs. 841(a)(1), 841(b)(1)(A), and 846 - Conspiracy to Distribute Fentanyl (Felony)

[UNDER SEAL]

The undersigned complainant being duly sworn states:

**Count 1: Conspiracy to Distribute 400 Grams and More of Fentanyl**

Beginning on a date unknown but at least as early as November 2025, and continuing up to and including the date of this Complaint, within the Southern District of California, and elsewhere, defendants, [redacted] and TRAVIS FAIRCLOTH, did knowingly and intentionally conspire with each other and with other persons, known and unknown, to distribute 400 grams and more of a mixture and substance containing a detectable amount of N-Phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide (commonly

known as fentanyl), a Schedule II Controlled Substance; all in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), and 846.

**Count 2: Conspiracy to Distribute 400 Grams and More of Fentanyl**

Beginning on a date unknown but at least as early as November 2025, and continuing up to and including the date of this Complaint, within the Southern District of California, and elsewhere, defendants, [redacted] and DIEGO LA MADRID, did knowingly and intentionally conspire with each other and with other persons, known and unknown, to distribute 400 grams and more of a mixture and substance containing a detectable amount of N-Phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide (commonly known as fentanyl), a Schedule II Controlled Substance; all in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), and 846.

**Count 3: Conspiracy to Distribute 400 Grams and More of Fentanyl**

Beginning on a date unknown but at least as early as November 2025, and continuing up to and including the date of this Complaint, within the Southern District of California, and elsewhere, defendants, [redacted] [redacted] [redacted] and LEONARDO MONTELEONE, did knowingly and intentionally conspire with each other and with other persons, known and unknown, to distribute 400 grams and more of a mixture and substance containing a detectable amount of N-Phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide (commonly known as fentanyl), a Schedule II Controlled Substance; all in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), and 846.

**Count 4: Conspiracy to Distribute 400 Grams and More of Fentanyl**

Beginning on a date unknown but at least as early as November 2025, and continuing up to and including the date of this Complaint, within the Southern District of California, and elsewhere, defendants, [redacted] and ANDREW REVA, did knowingly and intentionally conspire with each other and with other persons, known and unknown, to distribute 400 grams and more of a mixture and substance containing a detectable amount of N-Phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide (commonly known as fentanyl), a Schedule II Controlled Substance; all in violation of Title 21, United

States Code, Sections 841(a)(1), 841(b)(1)(A), and 846.

**Count 5: Conspiracy to Distribute 400 Grams and More of Fentanyl**

Beginning on a date unknown but at least as early as November 2025, and continuing up to and including the date of this Complaint, within the Southern District of California, and elsewhere, defendants, [redacted] and GARRET HUTTER, did knowingly and intentionally conspire with each other and with other persons, known and unknown, to distribute 400 grams and more of a mixture and substance containing a detectable amount of N-Phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide (commonly known as fentanyl), a Schedule II Controlled Substance; all in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), and 846.

**Count 6: Conspiracy to Distribute 400 Grams and More of Fentanyl**

Beginning on a date unknown but at least as early as November 2025, and continuing up to and including the date of this Complaint, within the Southern District of California, and elsewhere, defendants, [redacted] and RENEE TRUJILLO, did knowingly and intentionally conspire with each other and with other persons, known and unknown, to distribute 400 grams and more of a mixture and substance containing a detectable amount of N-Phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide (commonly known as fentanyl), a Schedule II Controlled Substance; all in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), and 846.

**Count 7: Conspiracy to Distribute 400 Grams and More of Fentanyl**

Beginning on a date unknown but at least as early as November 2025, and continuing up to and including the date of this Complaint, within the Southern District of California, and elsewhere, defendants, [redacted] and ROBERT CLARK, did knowingly and intentionally conspire with each other and with other persons, known and unknown, to distribute 400 grams and more of a mixture and substance containing a detectable amount of N-Phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide (commonly known as fentanyl), a Schedule II Controlled Substance; all in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), and 846.

**Count 8: Conspiracy to Distribute 400 Grams and More of Fentanyl**

Beginning on a date unknown but at least as early as November 2025, and continuing up to and including the date of this Complaint, within the Southern District of California, and elsewhere, defendants, [redacted] and JOSEPH EGAN, did knowingly and intentionally conspire with each other and with other persons, known and unknown, to distribute 400 grams and more of a mixture and substance containing a detectable amount of N-Phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide (commonly known as fentanyl), a Schedule II Controlled Substance; all in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), and 846.

**Count 9: Conspiracy to Distribute 400 Grams and More of Fentanyl**

Beginning on a date unknown but at least as early as November 2025, and continuing up to and including the date of this Complaint, within the Southern District of California, and elsewhere, defendants, [redacted] and NICOLE LINES, did knowingly and intentionally conspire with each other and with other persons, known and unknown, to distribute 400 grams and more of a mixture and substance containing a detectable amount of N-Phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide (commonly known as fentanyl), a Schedule II Controlled Substance; all in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), and 846.

**Count 10: Conspiracy to Distribute 400 Grams and More of Fentanyl**

Beginning on a date unknown but at least as early as November 2025, and continuing up to and including the date of this Complaint, within the Southern District of California, and elsewhere, defendants, [redacted], JEREMY JARRELL, and ERIKA PRICE, did knowingly and intentionally conspire with each other and with other persons, known and unknown, to distribute 400 grams and more of a mixture and substance containing a detectable amount of N-Phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide (commonly known as fentanyl), a Schedule II Controlled Substance; all in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), and 846.

//

**Count 11: Conspiracy to Distribute 400 Grams and More of Fentanyl**

Beginning on a date unknown but at least as early as November 2025, and continuing up to and including the date of this Complaint, within the Southern District of California, and elsewhere, defendants, [redacted] and STAN SZUMILAS, did knowingly and intentionally conspire with each other and with other persons, known and unknown, to distribute 400 grams and more of a mixture and substance containing a detectable amount of N-Phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide (commonly known as fentanyl), a Schedule II Controlled Substance; all in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), and 846.

**Count 12: Conspiracy to Distribute 400 Grams and More of Fentanyl**

Beginning on a date unknown but at least as early as November 2025, and continuing up to and including the date of this Complaint, within the Southern District of California, and elsewhere, defendants, [redacted] and CHRISTOPHER CURLL, did knowingly and intentionally conspire with each other and with other persons, known and unknown, to distribute 400 grams and more of a mixture and substance containing a detectable amount of N-Phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide (commonly known as fentanyl), a Schedule II Controlled Substance; all in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), and 846.

//

//

//

//

//

//

//

//

//

//

**Count 13: Conspiracy to Distribute 400 Grams and More of Fentanyl**

Beginning on a date unknown but at least as early as November 2025, and continuing up to and including the date of this Complaint, within the Southern District of California, and elsewhere, defendants, [redacted] and [redacted], did knowingly and intentionally conspire with each other and with other persons, known and unknown, to distribute 400 grams and more of a mixture and substance containing a detectable amount of N-Phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide (commonly known as fentanyl), a Schedule II Controlled Substance; all in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), and 846.

The complainant states that this complaint is based on the attached Probable Cause Statement, incorporated herein by reference.

ALEX A LAHBABI
Digitally signed by ALEX A LAHBABI
Date: 2026.09.02 11:17:46 -07'00'

Alex Lahbabi
Special Agent
Homeland Security Investigations

Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1, this 2nd day of September 2026.

David Leshner

Honorable David D. Leshner
United States Magistrate Judge

**PROBABLE CAUSE STATEMENT**

I, Alex Lahbabi, being duly sworn, declare under penalty of perjury that the following statement is true and correct:

**TRAINING AND EXPERTISE**

I am a Special Agent with the United States Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations ("HSI") and have been so employed since March of 2025.

I am a graduate of the Criminal Investigator Training Program and the Homeland Security Investigations Special Agent Training Program at the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia. During my formal training at FLETC, I learned the fundamentals of narcotics investigations including, but not limited to, drug identification and detection, interdiction and familiarization with United States narcotics laws, financial investigations and money laundering, identification and seizure of drug-related assets, organized crime investigations, physical and electronic surveillance, undercover operations, preparing affidavits for arrest warrants and search warrants, gathering of evidence, and preserving crime scenes.

Prior to working for HSI, I was employed with Customs and Border Protection ("CBP") as an Officer at the San Ysidro Port of Entry from 2015 to 2025 and employed with the U.S. Border Patrol as an Agent at the Nogales Border Patrol Station from 2010 to 2015.

I am currently assigned to the San Diego Fentanyl Abatement and Suppression Team ("FAST") and have been since October of 2025. FAST is comprised of HSI Special Agents, Task Force Officers ("TFOs"), and Task Force Agents from several local and federal law enforcement partners. FAST primarily investigates fentanyl distribution networks operating within San Diego County with the primary focus of lowering the fentanyl overdose death toll.

I have participated in over one hundred investigations involving the distribution of controlled substances and money laundering that have resulted in arrests, indictments, and convictions. During these investigations, I have used various investigative techniques including physical and stationary surveillance, informants and cooperating sources, pen register and trap and trace devices, telephone toll analysis, undercover operations, search

warrants, tracking warrants, and electronic examinations of evidence. Through these investigations, I have obtained knowledge regarding the dealing of methamphetamine, cocaine, fentanyl, heroin, and pharmaceutical drugs. I have also obtained knowledge regarding the ordinary meaning of controlled substance slang and jargon as it pertains to the sales and transportation of narcotics. I have been involved in over 400 arrests of people involved in the possession of controlled substances for sale. I have, therefore, gained a working knowledge and insight into operational habits of narcotics traffickers.

**BASES OF KNOWLEDGE**

The following is based on my investigation, oral and written reports by other law enforcement officers, conversations with other investigators knowledgeable about controlled substance investigations, physical and electronic surveillance, interviews, subpoenas, database checks, searches, toll analysis, other investigations, and public records. The following does not contain all the information known to me or other federal agents and state and local officers regarding this investigation but does contain those facts believed to be necessary to establish the requisite probable cause for the violations alleged herein. Communications in Spanish have been translated into the English language. All dates, times, and amounts are approximate.

**Defendant 1 - [redacted]**

In November 2025, FAST agents initiated an investigation into a drug trafficking organization (DTO) supplying fentanyl to multiple street-level dealers throughout San Diego, California. On November 25, 2025, agents seized 4.8 kilograms of fentanyl, 0.8 kilograms of methamphetamine, $10,042, and arrested Fabian Iniguez Ontiveros. A subsequent search of Iniguez's cell phone revealed dozens of different fentanyl sub-distributors working for this DTO. Wire transfers and Iniguez's jail calls revealed Iniguez was working for [redacted], a Mexican citizen, who is the leader of this DTO. Investigators also seized drug ledgers from Iniguez which showed that [redacted] organization routinely sells an ounce of fentanyl for $600 to $700, including making up to $20,000 in one night of deliveries. After

Iniguez was arrested, [redacted] principal fentanyl distributor in the United States was Maricielo Ibarra Barrera.

From April to May 2026, investigators conducted seven controlled purchases of fentanyl coordinated by [redacted], and delivered by, Ibarra. Investigators then tracked Ibarra's vehicles via GPS and conducted dozens of surveillance operations. On multiple occasions, investigators observed Ibarra drive from her residence to various locations around San Diego and make multiple short stops consistent with drug distribution.

Beginning in June 2026 and continuing through August 2026, investigators obtained three rounds of federal wiretaps targeting cellular telephones used by [redacted]. During these periods of interceptions, investigators intercepted dozens of calls and text messages between [redacted] and members of his organization. These wiretaps led directly to the physical surveillance and multiple seizures of fentanyl described in more detail below as well as the identification of the principal members of his organization.

On August 17, 2026, agents arrested Ibarra (she is charged in 26-mj-04889-VET). During a post-*Miranda* interview, Ibarra admitted to drug trafficking on behalf of [redacted]. Ibarra stated they would front up to $300 worth of drugs to their buyers, and they would sometimes pay their debt back little by little or at once for the next transaction. Ibarra admitted they would make up to $50,000 a month. Ibarra stated she personally made $300 a day for delivering drugs. On the same date, agents executed a search warrant at Ibarra's residence. Investigators discovered approximately 1.7 kilograms of fentanyl and 0.6 kilograms of heroin in the detached garage and $15,568 in the kitchen and bedroom of the apartment. Investigators also seized Ibarra's cellular telephone and multiple drug ledgers.

As discussed below, through wiretap intercepts, vehicle tracking, physical surveillance, seizures, review of seized communications and drug ledgers, and other investigative means, investigators have penetrated [redacted] and Ibarra's fentanyl distribution organization in San Diego and identified Travis FAIRCLOTH, Diego LA MADRID, Leonardo MONTELEONE, Andrew REVA, Garret HUTTER, Renee TRUJILLO, Robert CLARK, Joseph EGAN, Nicole LINES, Jeremy JARRELL, Erika PRICE, Stan

SZUMILAS, Christopher CURLL, and [redacted] as subdistributors. As discussed in more detail below, I believe there is probable cause to charge each of the following defendants with conspiracy to distribute fentanyl.

**Defendant 2 - Travis FAIRCLOTH**

During the investigation, agents identified Travis FAIRCLOTH as a subdistributor for [redacted] fentanyl trafficking organization. Below is a summary of some of the evidence implicating FAIRCLOTH.

From June 18, 2026, to August 2, 2026, investigators intercepted multiple communications between [redacted] and FAIRCLOTH, who I believe was using phone number 619-614-9939, which is subscribed to FAIRCLOTH.

On June 18, 2026, at approximately 9:32 p.m., investigators intercepted a call from [redacted] to FAIRCLOTH where [redacted] informed FAIRCLOTH that a female arrived. FAIRCLOTH said he would be out in five minutes. Approximately eight minutes later, investigators, using a drone, saw Ibarra's Ford Ranger (the "Ranger") parked in front the driveway of FAIRCLOTH's residence in Lemon Grove, California. The drone footage showed Ibarra step out of the Ranger and meet briefly with a man, believed to be FAIRCLOTH.

A little more than a week later, on June 27, 2026, investigators intercepted another call from [redacted] to FAIRCLOTH. [redacted] told FAIRCLOTH, "10 minutes at Carls Jr," which investigators believe was [redacted] and FAIRCLOTH discussing when and where a drug transaction was to occur. Approximately 19 minutes after the call, investigators saw the GPS tracker on another of Ibarra's cars, a Honda Civic (the "Civic"), drive to a Carl's Jr, restaurant in Lemon Grove, near FAIRCLOTH's residence.

Just three days later, on June 30, 2026, at about 7:05 p.m., investigators intercepted a text message FAIRCLOTH sent to [redacted], stating, "Hey bro, can I order 2." As noted herein, investigators made several seizures after intercepting calls. Based on the amounts seized after set-up calls, I believe the sub-distributors ordering from [redacted] requested amounts by the "Mexican ounce," which is approximately 25 grams. Because FAIRCLOTH ordered "two" from [redacted], investigators believe FAIRCLOTH was ordering two Mexican ounces of

fentanyl powder. Both before and after FAIRCLOTH's order—between 5:00 p.m. and 9:40 p.m.—[redacted] was in communication with Ibarra through WhatsApp.

At approximately 11:39 p.m., investigators watched FAIRCLOTH meet with Ibarra at the same Carl's Jr. in Lemon Grove. FAIRCLOTH entered Ibarra's Civic for about one minute and then exited. At approximately 11:47 p.m., a San Diego Sheriff's Deputy stopped FAIRCLOTH riding his bicycle in front of the Carl's Jr restaurant. The Deputy conducted record checks on FAIRCLOTH who was found to have a court ordered Fourth Amendment waiver rights subjecting him to search by law enforcement.

Sheriff's deputies searched FAIRCLOTH's phone and saw a message from June 30, 2026, in which FAIRCLOTH ordered "two" from a contact saved as "Juan Medina"[1] ("Juan"), among other messages between the two. In one of these other messages, Juan told FAIRCLOTH that a female would be there in 20 minutes. Investigators believe these messages were from [redacted] referring to Ibarra dropping off the drugs.

The Deputy observed another message with a woman. When asked about this contact, FAIRCLOTH stated the contact was his ex-girlfriend. FAIRCLOTH messaged her "what you need?" and the female messaged, "A G." FAIRCLOTH messaged, "I got you," and agreed to meet with her at Food 4 Less at 12:30 a.m. Based on my training and experience, I believe "A G" stands for "a gram." I believe the woman was one of FAIRCLOTH's customers who was going to buy a gram of fentanyl from FAIRCLOTH.

Drugs were not found on FAIRCLOTH. At around 12:11 a.m. on July 1, 2026, investigators searching the surrounding area at the Carls Jr. found a purple T-Mobile paper bag containing with what field tested positive for 51.47 grams of fentanyl (approximately 2 Mexican ounces) on the ground just a few feet from where FAIRCLOTH was first detained. FAIRCLOTH was asked about the T-Mobile paper bag, and he denied knowledge of the bag. However, the next day, a FAST member reviewed drone footage of FAIRCLOTH's meeting with Ibarra and observed FAIRCLOTH walking away from Ibarra's vehicle holding the same

[1] "Juan" is [redacted] pseudonym he uses with his sub-distributors. Several sub-distributors have referred to [redacted] as "Juan" in the intercepts.

purple T-Mobile bag that contained the fentanyl. I believe, based on my training, experience, and knowledge of this investigation, that FAIRCLOTH received approximately 51.47 grams of fentanyl from Ibarra on June 30, 2026, which FAIRCLOTH then threw away from himself when he was getting stopped by law enforcement.

As noted above, Ibarra was eventually arrested on August 17, 2026, and investigators obtained a search warrant for her phone. Ibarra's phone contained a message sent on August 17, 2026, from [redacted] to Ibarra, stating, "619 616 9939 Traver." As noted above, 619-616-9939 is the phone number registered to Travis FAIRCLOTH. Moreover, "Traver" appears to be a nickname for FAIRCLOTH, as it closely resembles his first name, "Travis."

Ibarra's phone contained a WhatsApp voice message from [redacted] to Ibarra sent on August 13, 2026, at approximately 7:12 p.m. [redacted] asked Ibarra about the quality of the drugs labeled "Rolex." [redacted] stated that, the other day, "Traver" called him and told him he was "struggling with the powder." Based on my training, experience, and knowledge of this case, I believe the message about "Traver" "struggling with the powder" meant Travis FAIRCLOTH was struggling to sell powdered fentanyl that had been provided by Ibarra.

<u>**Defendant 3 - Diego LA MADRID**</u>

During the investigation, agents identified Diego LA MADRID as a subdistributor for [redacted] fentanyl trafficking organization. Below is a summary of some of the evidence implicating LA MADRID.

From June 6, 2026, to July 14, 2026, investigators intercepted multiple calls and messages between [redacted] and the phone number 619-362-5952, which investigators believe is used by Diego LA MADRID because it is the same number listed in a Cash App account that is both held in LA MADRID's name and displays a photo of LA MADRID. As noted below, many of these calls appear to be setting up drug transactions and, after many of these set-up calls, investigators observed LA MADRID meeting with Ibarra, presumably to obtain drugs.

For example, on June 11, 2026, at approximately 6:09 p.m., [redacted] called LA MADRID and asked if he needed some today. LA MADRID said he wanted "a half." Based on my training and experience, and knowledge of the investigation, I believe a "half" is a half

"Mexican ounce," or about 12.5 grams of fentanyl. After intercepting this call, investigators deployed a drone in the area of LA MADRID's residence. At approximately 7:27 p.m., [redacted] told LA MADRID, "five minutes." LA MADRID responded he would be headed over there. At approximately 7:35 p.m., investigators saw LA MADRID cross the street in front of his residence and get into Ibarra's Civic, which drove to a nearby dead-end street. Investigators using the drone could see LA MADRID take an item out of a bag while he was sitting in the front seat of Ibarra's car. Investigators believe Ibarra delivered a half-ounce of fentanyl to LA MADRID.

On July 7, 2026, at approximately 1:38 p.m., LA MADRID called [redacted]. Below is a portion of that conversation, which was originally conducted in Spanish, translated into English by an HSI linguist:

| | |
|---|---|
| [redacted]: | Hello . . . Hello? |
| LA MADRID: | Hello. |
| [redacted]: | What's up? |
| LA MADRID: | Ar…arou…around what time does she start? |
| [redacted]: | At three. At three. Are you going to need some? |
| LA MADRID: | Okay. Okay. Yes, a whole one. |
| [redacted]: | Alright, it'll be at three. |
| LA MADRID: | Okay. Thank you. |

Based on my training, experience, and knowledge of this case, "a whole one" is a Mexican ounce, or 25 grams, of fentanyl. Further, I believe LA MADRID was telling [redacted] he wanted to get 25 grams of fentanyl. Later, at approximately 3:56 p.m., LA MADRID texted [redacted], "And the person that wants the whole one has things to do and wants to leave." I believe LA MADRID was telling [redacted] that the person that LA MADRID was going to give "the whole one" to did not want to wait around for the fentanyl that had not yet been delivered. LA MADRID also texted, "He has things to do. And he was the one that did not arrive yesterday." At approximately 4:33 p.m., [redacted] called LA MADRID and [redacted] said

that "she" was on her way. I believe [redacted] was telling LA MADRID that Ibarra was on her way to deliver the fentanyl.

When investigators intercepted the calls between [redacted] and LA MADRID, they went to LA MADRID's residence to interdict the fentanyl. At approximately 4:49 p.m., investigators saw Ibarra drive her Honda Civic to LA MADRID's residence, LA MADRID get into the Civic for about a minute, and then LA MADRID get back out of the Civic. A San Diego Police Department (SDPD) Officer then stopped LA MADRID as he walked back to his residence and seized from his person about 25.51 grams of a substance that later field-tested positive for fentanyl. [redacted] was in contact with Ibarra through WhatsApp while Ibarra was meeting with LA MADRID.

In a post-arrest statement, LA MADRID claimed he did not know that the powder seized from him was fentanyl. He claimed he got the substance from a woman he did not know and was going to be paid $100 for delivering it to "Lucky," another person whose real name he claimed he did not know.

**Defendant 4 - Leonardo MONTELEONE**

During the investigation, agents identified Leonardo MONTELEONE as a subdistributor for [redacted] fentanyl trafficking organization. Below is a summary of some of the evidence implicating MONTELEONE.

On March 2, 2026, investigators observed Ibarra driving a Nissan Rogue (the "Rogue") belonging to her sister, Merary Ibarra, to Fiesta Island in San Diego. Investigators had set up physical surveillance at MONTELEONE's parked RV in Fiesta Island. At approximately 8:43 p.m., investigators observed Ibarra arrive in the Rogue and walked inside MONTELEONE's RV for approximately 14 minutes before leaving. About half an hour after Ibarra left, investigators, who knew MONTELEONE had multiple state felony warrants for his arrest, approached MONTELEONE's RV. A narcotics canine alerted at the RV and investigators found 26 grams of fentanyl, contained in two separate plastic bags, on MONTELEONE's person. The substance was later confirmed to be fentanyl by testing at the

DEA lab. Also, inside the RV, were glass vials and two digital scales with suspected fentanyl residue.

Post-arrest, MONTELEONE said that he had received the fentanyl about an hour before—which investigators knew was around the time Ibarra had met with him. MONTELEONE claimed the fentanyl was for his personal use, to "self-medicate," and that he had gotten the fentanyl from someone named "Raul." However, based on my training and experience, 26 grams is a distributable amount of fentanyl.

From June 24, 2026, to July 13, 2026, investigators intercepting [redacted] phone number intercepted several calls with 619-838-9976 (the "9976 number"), which investigators believed was another number used by MONTELEONE in part because (i) MONTELEONE provided that number to police when he was arrested in 2023, and (ii) the subscriber to the 9976 number is "L.M."—MONTELEONE's initials. After many of these intercepted conversations, investigators saw MONTELEONE meet with Ibarra. Investigators believe Ibarra was delivering fentanyl to MONTELEONE at [redacted] direction.

For example, on July 2, 2026, at approximately 5:20 p.m., [redacted] called MONTELEONE. Below is an excerpt of the conversation, which occurred in English.

MONTELEONE: Hello.
[redacted]: Hey, buddy. Hey, you...
MONTELEONE: How you doing?
[redacted]: ...hey, you... you... you need today?
MONTELEONE: What's that?
[redacted]: You need today?
MONTELEONE: Yeah.
[redacted]: How much, half?
MONTELEONE: Umm... yeah.
[redacted] Are... are... are you ready? Uh, are you, right now?
MONTELEONE: Yeah.
[redacted]: Ready now. Yeah?

MONTELEONE: Yeah. I'm ready now.

[redacted]: Same... same place?

MONTELEONE: No. Um... I'll send you... I'll—I'll—I'll send you where I'm at.

Based on my training and experience, and knowledge of this investigation, when [redacted] offered MONTELEONE a "half," I believe he offered half of a Mexican ounce—or 12.5 grams—of fentanyl.

From approximately 7:19 p.m. to 7:27 p.m., investigators watched the location of the GPS tracker on Ibarra's Honda Civic as it drove to Mission Bay South Shores Park Parking lot. After Ibarra's Honda Civic departed the area, investigators drove by the area where the Civic stopped and saw MONTELEONE's truck and RV parked there. This location is a few minutes away from his usual parking spot in Fiesta Island. Based on Ibarra's travel to MONTELEONE's RV and the intercepted conversation of MONTELEONE ordering a half, I believe Ibarra delivered fentanyl to MONTELEONE.

On July 29, 2026, an investigator again conducted surveillance near MONTELEONE's truck and RV parked in Fiesta Island. At approximately 9:27 p.m., the investigators saw Ibarra drive up to MONETELEONE's RV, go inside for about one minute, and then leave. I believe based on my training, experience, and knowledge of this investigation, that Ibarra delivered fentanyl to MONTELEONE. About a half hour later, at around 9:57 p.m., the investigator saw a man drive up next to the RV, exit his vehicle, and enter the RV for approximately 13 minutes. The investigator saw the same man leave MONTELEONE's RV, walk up to his own vehicle, and start smoking a substance using a torch and saw a shiny item in his hand resembling aluminum. At approximately 10:21 p.m., the man departed the area in his vehicle. Based on my training and experience, I believe the man had purchased fentanyl from MONTELEONE and smoked it outside the RV.

**<u>Defendant 5 - Andrew REVA</u>**

During the investigation, agents identified Andrew REVA as a subdistributor for [redacted] fentanyl trafficking organization. Below is a summary of some of the evidence

implicating REVA.

From June 15, 2026, to June 25, 2026, investigators intercepted multiple calls between [redacted] and phone number 760-557-0193 (the 0193 number), subscribed to and believed to be used by Andrew REVA. As noted below, on at least two occasions, investigators intercepted set-up calls between [redacted] and the 0193 number and subsequently saw suspected drug deliveries from Ibarra to REVA.

On June 15, 2026, at approximately 10:20 p.m., [redacted] called REVA and told him to "come out." REVA told [redacted] he just got off the freeway and suggested meetings at Taco Bell. [redacted] told REVA that "she" was at "the same place," at Target. I believe, based on my training, experience, and knowledge of this investigation that "she" was referring to Ibarra. At approximately 10:27 p.m., investigators saw Ibarra arrive at the Mission Valley Target store and meet with REVA outside of their vehicles.

Ten days later, on June 25, 2026, at approximately 8:08 p.m., [redacted] called REVA and they discussed REVA picking up a "half" at an In-N-Out. REVA and [redacted] agreed to meet at an In-N-Out and [redacted] told REVA to be ready in 35 minutes. As stated above, based on my training, experience, and knowledge of this investigation, I believe a "half" refers to a half ounce of fentanyl. At approximately 10:26 p.m., investigators watched the location data of the GPS tracker on Ibarra's Civic as it traveled to the Mission Valley In-N-Out Burger, just a few storefronts down from the Mission Valley Target where Ibarra and REVA had met on June 15, 2026. Investigators went to that location and saw Ibarra park the Civic next to the Toyota Tacoma (the "Tacoma"), registered to REVA. Ibarra walked to the driver's side of the Tacoma, where REVA was waiting with his driver's door open. Ibarra and REVA appeared to exchange items while outside their vehicles and Ibarra departed minutes later in the Civic. REVA walked to and ate at a nearby Taco Bell restaurant.

Investigators continued to watch REVA. At approximately 11:15 p.m., he got in the Tacoma, left the In-N-Out parking lot, and drove onto California State Route 163. At approximately 11:19 p.m., a San Diego Police Officer stopped the Tacoma on Route 163, near the Balboa Avenue Exit. A drug dog alerted to the vehicle and REVA admitted to officers he

had fentanyl in his vehicle. Officers found drug paraphernalia and methamphetamine residue inside the Tacoma. Officers also searched REVA and found a bag containing approximately 12.21 grams (half of a "Mexican ounce") of fentanyl powder, a pre-measured smaller baggie with approximately 0.26 grams of fentanyl, and a separate bag containing approximately 2.59 grams of fentanyl powder. REVA had a total of 15.06 grams of fentanyl on his person. Also, on REVA's person were two additional baggies of methamphetamine, weighing 2.26 grams total.

Based on my training, experience, and knowledge of the investigation, I believe REVA purchased the fentanyl from Ibarra. Based on my training and experience, I know 15 grams of fentanyl is a distribution quantity of fentanyl. Moreover, I believe that the fentanyl was divided into smaller bags of 0.26 grams and 2.59 grams for REVA to distribute the fentanyl to others.

After his arrest, REVA said he bought the drugs from a man named "Xavier," who he met through his cousins. However, I believe REVA was provided drugs by Ibarra, as discussed previously. REVA claimed the drugs were for personal use, to deal with his leg pain.

**<u>Defendant 6 - Garret HUTTER</u>**

During the investigation, agents identified Garret HUTTER as a subdistributor for [redacted] fentanyl trafficking organization. Below is a summary of some of the evidence implicating HUTTER.

From June 6, 2026, to August 10, 2026, investigators intercepted calls between [redacted] and the phone number 619-753-4314 (the "4314 number"), subscribed to and believed to be used by HUTTER. HUTTER frequently requested quantities described as "one," "two," "three," and, on at least one occasion, potentially "four." Based on my training, experience, and knowledge of this investigation, I believe the quantities referred to in HUTTER's calls with [redacted] were referring to Mexican ounces of fentanyl. On multiple occasions, shortly after HUTTER communicated with [redacted] about obtaining quantities of suspected fentanyl, investigators observed or tracked Ibarra traveling to HUTTER's residence. I believe, based

on my training, experience, and knowledge of this investigation, these visits were consistent with drug deliveries.

For example, on June 10, 2026, at approximately 9:59 p.m., [redacted] called HUTTER. HUTTER told [redacted], in English, that he was at the ATM and would be back at home in five minutes. [redacted] said he did not understand and HUTTER repeated, in Spanish, that he was at the ATM and would be back home in five minutes. [redacted] asked, "how much" and HUTTER responded, "for sure one, maybe two." At approximately 10:50 p.m., investigators, using a drone, saw Ibarra drive her Civic to HUTTER's residence, park, meet with HUTTER, and walk into the residence. After a few minutes, Ibarra walked out of the residence and drove away. I believe Ibarra was delivering at least one ounce of fentanyl to HUTTER.

About two weeks later, on June 23, 2026, at approximately 1:15 p.m., [redacted] texted HUTTER, "Good morning, I need you to be ready earlier, we don't want to be working late. If you don't place the order early, we won't be able to deliver it." About half an hour later, HUTTER texted [redacted], "OK, I'll get to work on getting some money together and send you the order ASAP." Based on my training and experience, and knowledge of the investigation, I believe [redacted] was referring to an order of fentanyl.

At approximately 6:36 p.m., HUTTER texted [redacted] in Spanish[2], "What's up my friend? I'm going to need three. If you can, let me know when she'll be here. I'd appreciate it. That way, I can make su . . . know when she'll be here. I'd appreciate it. That way, I can make sure all the money is here before she gets here . . . make sure all the money is here before she gets here." HUTTER then followed up with another text, "I might need four total but three for sure." Based on my training and experience, and knowledge of this investigation, I believe HUTTER was ordering three or four ounces of fentanyl.

At approximately 10:07 p.m., investigators using a drone saw Ibarra arrive at HUTTER's residence, park in front of the chain link fence, meet HUTTER, and walk inside the residence. Investigators also saw multiple men in the front yard. About two minutes later,

[2] Investigators believe HUTTER may use a translation application. The messages in Spanish were translated by an HSI linguist.

[redacted] texted HUTTER, "I only have 1 ½." At approximately 10:12 p.m., HUTTER texted [redacted] in Spanish, "I need at least two and a half. I already have the customers here, if it's possible, I didn't know I'd be limited." Ibarra left HUTTER's residence at approximately 10:33 p.m. At approximately 10:45 p.m., investigators saw HUTTER approach the driver's door of a Range Rover that pulled into the front of HUTTER's residence. Approximately one minute later, the Ranger Rover departed. Based on training and experience, and my knowledge of the investigation, I believe HUTTER purchased fentanyl from Ibarra and began distributing it to his fentanyl customers, including the individual in the Range Rover.

**Defendant 7 - Renee TRUJILLO**

During the investigation, agents identified Renee TRUJILLO as a subdistributor for [redacted] fentanyl trafficking organization. Below is a summary of some of the evidence implicating TRUJILLO.

From June 6, 2026, to August 18, 2026, investigators intercepted multiple calls between [redacted] and the phone number 619-317-7353 (the 7353 number), believed to be used by TRUJILLO because TRUJILLO listed the 7353 number during her May 12, 2026, arrest by the La Mesa Police Department. On these intercepted calls, [redacted] and TRUJILLO discussed the sale of drugs from [redacted] to TRUJILLO and TRUJILLO's distribution of drugs. These conversations were all in Spanish and have been translated by an HSI linguist.

For example, on June 6, 2026, investigators intercepted a call where [redacted] asked TRUJILLO to meet with Ibarra to return a bag of suspected drugs, money, and a ledger notebook to TRUJILLO. [redacted] also told TRUJILLO that they were going to stop "working" for a while. I believe [redacted] meant he was not going to be distributing drugs for a while. During a separate conversation, TRUJILLO asked [redacted] if she could buy some of the drugs in Ibarra's bag because [redacted] was TRUJILLO's only drug source of supply and TRUJILLO needed the drugs to "make money." I believe TRUJILLO was referring to selling the drugs to other people to make money. On June 9, 2026, at approximately 6:58 p.m., TRUJILLO called [redacted]. Excerpts of the conversation, translated from Spanish into English, follow.

TRUJILLO: …that, um, do you…do you remember what I…what I talked to you about yesterday?

[redacted]: Yes.

TRUJILLO: Yeah, tell her that… no, uh and you too, I don't want it cheaper or anything, I just want,…want to… because you're halting… I have nobody else to get from, that's why I want to… to… to… to see if you can allow me to take out some of that and I want it at the same price. I don't want anything less nor cheaper, none of that. Just…

[redacted] Uh…

TRUJILLO: …to have it here, because you won't want to do business because of what is going on, but during those days, mm, I can make some money and you can also make some money instead of it just being there. You know?

[redacted]: Yes. Yes, well… but, when? How much do you want me to leave with you? One whole piece?

TRUJILLO: No, no, o no, well I do have it, I have the money for, for one, one, maybe two, two whole ones.

[redacted]: You have cash for two?

TRUJILLO: Yes.

TRUJILLO: Uh, yes, I have some to… to pay for… I think two whole ones. If not, one and a half for sure. But if you're not going to work, well, I'll deliver that money and… the only thing I don't want is to not… to not be left with nothing and since you're not going to work then, where am I going to get some? You understand? But I…

[redacted] Yes.

Based on my training, experience, and knowledge of the investigation, I believe TRUJILLO was asking [redacted] to sell her one or two ounces of fentanyl from Ibarra's bag so that she had enough to sell ("make some money") while [redacted] was taking a break from distributing drugs, because TRUJILLO had no other sources of supply.

On June 10, 2026, investigators intercepted another conversation during which [redacted] and TRUJILLO discussed TRUJILLO returning the bag of drugs to Ibarra. At approximately 8:59 p.m., TRUJILLO called [redacted] and said she was at the car wash. [redacted] told TRUJILLO she would have to wait for a bit since the female left. At 9:18 p.m., investigators drove to the car wash next to Ibarra's apartment complex and also deployed a drone to observe the area. Investigators saw TRUJILLO at the car wash, cleaning the Honda van that is registered to her. At approximately 9:44 p.m., investigators observed Ibarra's Civic arrive at the car wash. TRUJILLO walked over and handed a bag to Ibarra through the driver's door window, which I believe based on my training and experience to be the bag of fentanyl discussed in the intercepts mentioned above.

On June 25, 2026, at approximately 8:50 p.m., investigators intercepted a call where [redacted] told TRUJILLO that "Fernanda"—referring to Ibarra[3]—said she only has the "other stuff" that TRUJILLO does not like. TRUJILLO complained that Fernanda should have let her know beforehand. TRUJILLO stated she had told Fernanda yesterday that she really needed some today and that Fernanda even said she would meet TRUJILLO at five. Below are excerpts of the conversation, translated from Spanish to English.

TRUJILLO: Oh, but how can that be? I don't have anything, anything and I have all of the people's money

[3] "Fernanda" is one of Ibarra's aliases. During her arrest on August 17, 2026, Ibarra possessed a fraudulent Mexican identification card with her own photo, in the name of Fernanda Lopez Garca. Investigators later found messages between Ibarra and [redacted] in which Ibarra sent a photo of herself to [redacted] for the purpose of having a fake Mexican ID created. This same photo of Ibarra was the one on the Mexican ID for "Fernanda" that Ibarra possessed on the date of her arrest. After her arrest, Ibarra confirmed to investigators that the ID for "Fernanda" was a fraudulent ID.

[redacted] I mean, she can... take you this kind. What can I do? I mean, she is going to receive the other one.

TRUJILLO: I get some from you every day. Why didn't she save me some?

[redacted]: Well, there are other people that... that also want that kind, but I mean, not... And while checking right now, she realized that she didn't have any. I can take you the other one and the... and... and tomorrow we will change it.

TRUJILLO: No, I can't do it. No, no, I'll kill people with that stuff. I can't.

[redacted] Oh, well, then...

TRUJILLO: I can't get that stuff.

[redacted] ...tomorrow about six she will have it prepared already.

[TRUJILLO continues to complain to [redacted]

TRUJILLO: I know. But she knows that I'm getting daily. Oh... it's because every time that happens, they start going someplace else. And then the people, they... they find something cheaper or better and then they leave me and I am screwed. And I'm gathering money to get my mother's ashes.

[TRUJILLO and [redacted] plan to meet the next day]

TRUJILLO: Yes, yes. And the... the three people that gave me almost... their mone-... um... the three of them don't like that at all. Oh, well.

[redacted] And almost everybody... almost everybody wants that. I don't know why... I mean...

TRUJILLO: Mm...

[redacted] ...there are a lot of people that only want that. That's why there are few for the kind that you like it.

TRUJILLO: No, that stuff makes you sleep.

[redacted] Well, yeah, it's more...

TRUJILLO: No, everybody likes that other stuff, all my people lov-.. they like that a lot.

[redacted] Well, I don't know and...

TRUJILLO: No, no... no. No, it's because the other one makes them sleep. All my people work.

[redacted] Oh! Okay, okay, okay. And... and... and... and they don't... don't like to sleep only.

TRUJILLO: Yes, and the other kind is liked by the...by the homeless, the... ones from the street.

[redacted] Yes, yes, yes because... Oh, no, they can sleep all day long if they want.

TRUJILLO: Yes.

In other text conversations between [redacted] and Ibarra, they discussed product "with turbo" and "without turbo." In one conversation, [redacted] told Ibarra that individuals who use the kind "with turbo" will "sleep all day." Based on my training, experience, and knowledge of this case, I believe "turbo" is xylazine, a sedative that is commonly mixed with fentanyl. Based on my training, experience, and knowledge of the investigation, I believe that when TRUJILLO told [redacted] she did not want the "stuff" that "makes you sleep," she was stating she did not want fentanyl with "turbo" or xylazine.

On June 26, 2026, at approximately 6:28 p.m., TRUJILLO called [redacted] and [redacted] told her that "she" would be there in about 40 minutes. [redacted] asked TRUJILLO if she wants the same that she always gets, the one she likes, or if she wants the kind her girlfriend likes. TRUJILLO confirmed she wants the one she likes, which, based on my training and experience, I believe to the fentanyl they were talking about the previous day.

At approximately 7:34 p.m., investigators watching the location of the GPS tracker on Ibarra's Civic saw the Civic went to a house at 4241 44th Street, San Diego, a location where investigators had seen Ibarra and TRUJILLO meet several times before. Investigators went to the address and at around 7:35 p.m., investigators saw Ibarra pick up TRUJILLO, drive

to a 7-Eleven, let TRUJILLO out briefly, wait as TRUJILLO came back out, drive TRUJILLO back to the house, and then drive away. Surveillance footage showed that TRUJILLO was using the ATM inside the 7-Eleven. Based on my training, experience, and knowledge of the investigation, I believe Ibarra delivered fentanyl to TRUJILLO and gave TRUJILLO a ride to the ATM to withdraw the money used to purchase the fentanyl.

**Defendant 8 - Robert CLARK**

During the investigation, agents identified Robert CLARK as a subdistributor for [redacted] fentanyl trafficking organization. Below is a summary of some of the evidence implicating CLARK.

From June 6, 2026, to August 19, 2026, investigators intercepted multiple calls and text messages between [redacted] and phone number 619-341-4846 (the 4846 number), subscribed to and believed to be used by CLARK. During many of these communications, CLARK appeared to be requesting different quantities of fentanyl from [redacted] For example, on June 6, 2026, CLARK sent [redacted] a series of text messages, including, "Yes I do I've got 345.00," "Anything different rolex watches" and "Not that type foot powder."

Based on my training, experience, and knowledge of this investigation, I believe "rolex watches" and "foot powder" are terms for different types of drugs. While I am not sure which specific drug "rolex watches" refers to, I believe "foot powder" refers to "fentanyl powder," in part, because both have the same acronym ("FP") and they are both white powders. Moreover, based on CLARK stating he could pay $345, which is approximately the price of half an ounce of fentanyl, I further believe CLARK was asking to buy half an ounce of fentanyl.

Later that same day, June 6, 2026, at approximately 7:01 p.m., CLARK texted [redacted], "Dwight my friend." Investigators believe CLARK was referring to Dwight Street in San Diego, where investigators have seen Ibarra making suspected deliveries to CLARK.

At approximately 9:14 p.m., [redacted] called CLARK and said, "four minutes." Investigators believe this referred to Ibarra's arrival time because at approximately 9:19 p.m., investigators observed the GPS tracker on Ibarra's Civic travel to the intersection of Dwight Street and 44th Street. The Civic circled the block and then drove northbound into

the alley, toward Dwight Street. Investigators traveled to the area and saw a man believed to be CLARK walk away from Ibarra's Civic and into a house located near 4376 Dwight Street. At approximately 10:07 p.m., CLARK messaged [redacted], "Hey Juan I dropped money can you ask your driver to look." Based on intercepts between [redacted] and TRUJILLO, investigators believe Ibarra detected law enforcement in the area and got scared and left in haste while meeting with CLARK. Investigators believe Ibarra eventually dropped off her bag of drugs with TRUJILLO after meeting with CLARK.

Later, in the very early morning of June 7, 2026, CLARK messaged [redacted] several times asking about the cash he lost. Based on investigators' observations of CLARK walking away from Ibarra's Civic and CLARK's message to [redacted] that he "dropped money," investigators believe CLARK bought drugs from [redacted], which were delivered by Ibarra, and that he dropped some of his money in the alley during the transaction. At approximately 3:37 a.m., CLARK texted [redacted], "She didn't give me the half piece she had gotten the money I don't get it." Investigators believe "half piece" referred to a half ounce of fentanyl.

At approximately 12:46 p.m., CLARK texted [redacted], "We all are still looking for it, I even thought the guy with no legs had found it but she dropped me off, there was nobody around, nobody big homie just she, do you weigh it or does she because I never bring a scale bro, like I said who makes up the bags and who ties them together, I never bitch and complain when I ask for no duff or powder, I get it, I've been with you a long time big homie, I make you a lot of paper bro 300.00 a day and more, why would I stop last night."

Based on my training, experience, and knowledge of the investigation, I believe CLARK was initially talking about the money he lost during the last transaction with Ibarra and then later asked about who bags and weighs the fentanyl. I believe CLARK was also reminding [redacted] that he had been a fentanyl sub-distributor for a long time, making [redacted] $300 or more a day.

On July 31, 2026, at approximately 6:31 p.m., CLARK texted [redacted], "Hey big guy, I would like to get a half piece, three forty complete. No shake please and I want two whole pieces. Out of the two pieces, take out a gram a piece and put it on my half piece, no shake,

the tickets must be clean. Aight 340.00 complete, 1200.00 complete." Based on my training, experience, and knowledge of this investigation, I believe CLARK was ordering fentanyl from [redacted] I believe "half piece" referred to half a Mexican ounce of fentanyl, or about 12.5 grams of fentanyl. I believe "three forty complete" was $340—the price for a "half piece," or the half ounce, of fentanyl. I know, based on my training, experience, and knowledge of this investigation that $340 is within the range of current street prices for a half ounce of fentanyl powder. I further believe, based on my training, experience, and knowledge of this investigation, that "two whole pieces" refers to two Mexican ounces of fentanyl, or about 50 grams, and that "1200 complete" refers to the price of $1,200 for two Mexican ounces of fentanyl, which is consistent with current street prices. Finally, I believe, based on my training, experience, and knowledge of this investigation that ordering the fentanyl "no shake" and "the tickets must be clean" meant that CLARK wanted the fentanyl in the solid, rock-like form, and not loose powder. Based on the context of several intercepted messages with CLARK, and my training and experience, I believe CLARK regularly uses the term "tickets" or "dance tickets" to refer to fentanyl.

About two hours later, around 8:47 p.m., CLARK texted [redacted], "Thanks I'm complete and waiting so let me know if it's longer than 930 I'm heading over to Dwight."

Based on the context of the text message and my training and experience, when CLARK said, "I'm complete," he is referring to having the complete amount of money for the fentanyl purchase. Additionally, I believe CLARK is asking [redacted] to let him know if Ibarra will arrive past 9:30 p.m. I believe CLARK said he will be heading back to Dwight Street, which is his usual meeting location with Ibarra.

At approximately 10:31 p.m., investigators using the GPS tracker on Ibarra's Ranger saw that it traveled to Dwight Street, briefly stopping between 44th Street and Fairmount Avenue at the entrance to an alley. Investigators, who had seen Ibarra meet with CLARK at this location in the past, went to the area. Around 10:32 p.m., investigators saw CLARK enter the Ford Ranger, which was on Dwight Street, and saw the Ford Ranger drive south on 44th Street. CLARK remained in the car for about two minutes as the Ford Ranger drove to

entrance of the south end of the alley, on Myrtle Avenue between Fairmount Avenue and 44th Street, where CLARK got out. Investigators then saw CLARK walk through the alley toward the same location where he was originally picked up by the Ford Ranger. Based on my training and experience, I believe Ibarra delivered the two and a half ounces of fentanyl to CLARK.

Later, investigators saw CLARK enter his two-door Honda Civic with a woman and drive to the El Super store located two blocks north. Investigators observed the woman exit CLARK's Honda Civic and walk to a driver's door window of a Volkswagen sedan for a few minutes. Based on my training, experience, and knowledge of this investigation, I believe the woman conducted a drug transaction with the driver of the Volkswagen sedan, on behalf of CLARK.

**Defendant 9 - Joseph EGAN**

During the investigation, agents identified Joseph EGAN as a subdistributor for [redacted] fentanyl trafficking organization. Below is a summary of some of the evidence implicating EGAN.

From June 6, 2026, to August 18, 2026, investigators intercepted multiple calls between [redacted] and phone numbers 619-372-6108 (the 6108 number) and 619-343-6743 (the 6743 number), believed to be used by EGAN. The 6743 number is subscribed to EGAN. During the intercept period, investigators intercepted repeated communications between [redacted] and EGAN in which EGAN arranged to obtain fentanyl for his own distribution.

For example, on June 16, 2026, at approximately 8:38 p.m., [redacted] called EGAN at the 6743 number. Excerpts of the translated conversation are below.

| | |
|---|---|
| [redacted] | Hey, hey, buddy. You... you... you need today? |
| EGAN: | Hello. Yeah. |
| [redacted] | You need today? |
| EGAN: | Yes. |
| [redacted] | Uh, ready now or... or later? |
| EGAN: | Half an hour.. |

| | |
|---|---|
| [redacted] | Okay, okay. |
| EGAN: | O-... okay. |
| [redacted] | How much? Half? |
| EGAN: | Yeah, yeah, yeah. |
| [redacted] | Okay. Okay. Maybe 40 minutes. |
| EGAN: | Okay. Perfect. |
| [redacted] | Okay. Thank you. |

Investigators then used the GPS tracker on Ibarra's Civic to follow it to EGAN's residence on 32nd Street in San Diego. The tracker showed that the Civic stopped at 4574 32nd St, San Diego, from 10:08 p.m. to 10:11 p.m. EGAN listed 4574 32nd Street as his residence in his subscriber information for the 6743 number. Based on my training, experience, and knowledge of this investigation, I believe [redacted] and EGAN coordinated the distribution of a "half," and half ounce of fentanyl, and then, Ibarra delivered a half ounce of fentanyl to EGAN.

On June 18, 2026, at around 9:12 p.m., [redacted] messaged Ibarra in Spanish, "Joe"; "He's ready"; and "He wants one with turbo." Ibarra responded "Ok, I was about to leave." At approximately 9:38 p.m., [redacted] sent Ibarra a link to EGAN's residence, 4574 32nd St, San Diego, and sent another message right after with the name, "Joe." At approximately 9:53 p.m., Ibarra messaged [redacted], "to come out." One minute later, [redacted] called EGAN at the 6743 number and told EGAN "I'm there." Investigators believe [redacted] was referring to Ibarra being there, but mistakenly said "I" instead of "she" because he is not a proficient English speaker. Investigators using the GPS tracker on Ibarra's Ford Ranger determined that the car was driven to EGAN's residence and stopped there from 9:54 p.m. to 10:01 p.m. Investigators went to the residence and saw Ibarra park her Ford Ranger behind a different Ford truck registered to EGAN in the driveway. An investigator saw EGAN step out of the passenger seat of Ibarra's Ford Ranger. Ibarra left the area after EGAN exited her vehicle.

Based on my training, experience, and knowledge of this investigation, including information found in one of the drug ledgers later found in Ibarra's house, I believe Ibarra

delivered an ounce fentanyl to EGAN for $600. The drug ledger listed "Joe 1 $600" on June 18, 2026, which based on my training and experience, I believe to mean 1 Mexican ounce sold to "Joe" (EGAN's first name) for $600, which matches current street prices for fentanyl.

On August 14, 2026, investigators intercepted messages between [redacted] and the 6108 number, believed to be EGAN's new number because (i) the user identified himself as "Joe," which is EGAN's first name and how Ibarra and [redacted] referred to EGAN earlier in the investigation, (ii) on August 15, 2026, [redacted] and the user of the 6108 number arranged to have Ibarra deliver around 11:40 p.m., and at 11:53 p.m., Ibarra arrived at the EGAN's residence, and (iii) on August 17, 2026, [redacted] messaged the 6108 number asking, "do you still have this number 6192880894," which was a phone number subscribed to Melisa Bradley, whom investigators believe is EGAN's girlfriend and who listed her address for the 0894 number as EGAN's address.

On August 14, 2026, at approximately 6:33 p.m., the user of the 6108 number texted [redacted], "This is Joe. Can you bring me a half, and I will pay you for that as well as some of what I owe you. I can pay more tomorrow and the rest after."

On August 15, 2026, at approximately 4:46 p.m., [redacted] had the following text conversation with the 6108 number, believed to be used by EGAN.

| | |
|---|---|
| [redacted]: | You need today [?] |
| EGAN: | Yes one half and extra for what I owe. |
| [redacted]: | Okay, friend, she'll be ready at 10:30. |
| EGAN: | Ok. |
| EGAN: | Ready, when will she be arriving [?] |
| [redacted]: | I'm going to ask him. |
| EGAN: | ? |
| [redacted] | Maybe 40. [Sent 11:01 P.M.] |

At approximately 11:53 p.m., [redacted] called EGAN at the 6108 number and said, "I'm here"—which investigators believed was [redacted]' way to communicating that Ibarra was there, in broken English. About one minute later, investigators conducting physical

surveillance at EGAN's house saw Ibarra's Toyota Camry (registered to Fernanda Lopez Garcia, Ibarra's alias), park in EGAN's driveway for a few minutes, then leave. Based on my training and experience, and knowledge of this investigation, I believe EGAN ordered a half ounce of fentanyl, Ibarra delivered the fentanyl at the direction of [redacted], and EGAN paid both for the half ounce and for previous fentanyl purchases he had bought on credit.

On August 17, 2026, a search of Ibarra's phone revealed [redacted] messaged Ibarra, "619 372 6108 Joe." On the same day, [redacted] had another conversation with the 6108 number, still believed to be used by EGAN.

| | |
|---|---|
| [redacted]: | Hi friend, do you still have this number: 6192880894? |
| EGAN: | No. |
| EGAN: | I am ready. When can she come to my house. |
| [redacted]: | Ok. How much. |
| EGAN: | One half and extra for you. |
| [redacted]: | Ok. |
| EGAN: | Estimated time for arrival |
| [redacted]: | Later maybe 8. |

At approximately 7:26 p.m., [redacted] texted EGAN at the 6108 number, "She won't be ready today, my friend; she has some issues to resolve in Mexico." EGAN responded, "This is why it is so hard for me to keep making money with you guys. I rely on you and people rely on me. This last minute no work after waiting since Saturday cause no work on Sunday is messed up. I hate having to spend with other people." Based on my training, experience, and knowledge of this investigation, I believe [redacted]' texts above were him telling EGAN that Ibarra would not be available to deliver the half ounce of fentanyl that EGAN requested. When EGAN texted, "I rely on you, and people rely on me," based on my training and experience, I believe EGAN was saying that he relies on [redacted] to supply him with fentanyl and EGAN's customers, in turn, rely on EGAN for their fentanyl.

//

//

**Defendant 10 - Nicole LINES**

During the investigation, agents identified Nicole LINES as a subdistributor for [redacted] fentanyl trafficking organization. Below is a summary of some of the evidence implicating LINES.

From June 5, 2026, to July 30, 2026, investigators intercepted multiple communications between [redacted] and the phone number 619-315-9199 (the 9199 number), believed to be used by LINES because it is the phone number affiliated with a Cash App account held in LINES' name and showing a photo of LINES as its profile picture. During the intercept period, investigators intercepted repeated communications between [redacted] and LINES in which LINES arranged to obtain quantities of suspected fentanyl for distribution.

For example, on June 5, 2026, at approximately 7:03 p.m., investigators intercepted a call between [redacted] and LINES. During the call, LINES stated she was going to send the address of where to meet. Subsequently, LINES texted [redacted], "Address is 2362 Highview Lane, Spring Valley, CA 91977." At approximately 7:23 p.m.., LINES sent another text, "Is she close? My Uber will be here in 8 minutes."

At approximately 7:38 p.m., investigators traveled to 2362 Highview Lane and saw Ibarra's Honda Civic parked on the street in front of the residence. Investigators also saw a silver Toyota Corolla with flashing lights, which investigators believed was an Uber rideshare referenced by LINES in the intercepted messages to [redacted]. By the time investigators arrived, they saw LINES already in the front passenger seat of Ibarra's Civic. While in the Civic, at approximately 7:39 p.m., LINES texted [redacted], "I'm gonna have to put the money up to get another half. Can I get the whole one right now and send you the other 300 bucks later tonight. I showed her the Cash App name and she nodded her head yes and I'm in a hurry that's why I sent it to the wrong person." At approximately 7:43 p.m., investigators saw LINES walk back to the Toyota Corolla.

Based on my training, experience, and knowledge of this investigation, I believe LINES and [redacted] were discussing LINES' meeting with Ibarra to pick up drugs. Investigators believe LINES initially agreed to buy half an ounce of fentanyl from [redacted] and later wanted

a whole ounce, based on (i) her statement to [redacted] that she wanted "another half," (ii) her statement that she would send an additional $300 later, and (iii) investigators' knowledge that a common street price for fentanyl is $600 to $700 per ounce, or $300 for a half-ounce. Investigators believe LINES was referring to Ibarra when she referred to a female nodding her head because LINES was inside the Honda Civic with Ibarra and the text message LINES sent regarding Cash App was sent while she was inside the vehicle.

On July 4, 2026, at approximately 3:57 p.m., LINES called [redacted], and [redacted] asked if LINES was ready. LINES replied she would be ready in 30 minutes. [redacted] asked if "it's at the same place, at the bank" and LINES said, "yes." [redacted] asked, "if it's half" and LINES said "yes."

Based on my training, experience, and knowledge of this investigation, I believe when [redacted] asked LINES if it's "half," he was asking if LINES wanted a half ounce of fentanyl. Moreover, because investigators had previously seen LINES at a Chase Bank in Spring Valley, when she confirmed she would meet "at the same place, at the bank," investigators believed she was referring to this bank.

From approximately 5:15 p.m. to 5:28 p.m., investigators used the GPS tracker on Ibarra's Civic to track the Civic to the Chase Bank parking lot in Spring Valley. At approximately 5:26 p.m., investigators traveled to the Spring Valley Chase Bank and saw LINES enter Ibarra's Honda Civic for approximately one minute. Based on the observed interaction, and the conversation indicating LINES was ordering a "half," investigators believe LINES bought a half ounce of fentanyl from [redacted] and picked it up from Ibarra.

After LINES exited Ibarra's car, she walked back to her car, a Hyundai Santa Fe registered to LINES, and stood by her passenger door. About five minutes later, at approximately 5:31 p.m., LINES walked over to a gold Lexus sedan registered to Stephen Clark Wynne and enter the front passenger seat for approximately seven minutes. Investigators identified the driver of the Lexus as Wynne by comparing his likeness to his recent jail booking photo. Record checks of Wynne indicate he has multiple prior state convictions for possession of controlled substances. LINES exited the Lexus sedan, walked

back to her Hyundai Santa Fe, and entered the front passenger seat. At approximately 5:55 p.m., the gold Lexus repositioned further south in the parking lot, and about a half-hour later, at 6:26 p.m., the Lexus drove out of the parking lot. On both July 7, 2026, and July 14, 2026, the same thing happened—[redacted] and LINES spoke about LINES ordering "half," investigators saw LINES meet with Ibarra at the Spring Valley Chase Bank parking lot, and investigators saw LINES then meet with Wynne at the same parking lot. Investigators believe on these subsequent occasions, LINES was ordering fentanyl from [redacted], picking it up from Ibarra, and selling some of it to Wynne.

**<u>Defendants 11 - 12 - Jeremy JARRELL and Erika PRICE</u>**

During the investigation, agents identified Jeremy JARRELL and Erika PRICE as a subdistributors for [redacted] fentanyl trafficking organization. Below is a summary of some of the evidence implicating JARRELL and PRICE.

From June 26, 2026, to August 7, 2026, investigators intercepted multiple communications between [redacted] and phone number 619-305-4561 (the 4561 number), subscribed to and believed to be used by JARRELL. Many of these communications appeared to be conversations about the purchase of fentanyl. During the intercept period, investigators observed Ibarra meeting with JARRELL and his girlfriend, Erika PRICE, multiple times, including after communications between [redacted] and JARRELL.

On June 17, 2026, at approximately 10:50 p.m., investigators used a drone to observe Ibarra as she drove her Ford Ranger to Roberto's taco shop in Lakeside, California. Drone footage showed JARRELL entered Ibarra's Ford Ranger, Ibarra drove in a loop around the parking lot, JARRELL exited the car, and Ibarra left the parking lot, all within a four-minute span. After he exited Ibarra's car, JARRELL walked back over to the taco shop and met with two other individuals. Based on my training, experience, and knowledge of this investigation, I believe Ibarra supplied JARRELL with fentanyl, and then JARRELL met the two other individuals to distribute the fentanyl. About a half-hour later, around 11:20 p.m., JARRELL left the taco shop on an electric scooter. A San Diego Sheriff's Deputy tried to stop JARRELL, but he fled and the Deputy lost him. Based on my training, experience, and knowledge of this

investigation, I believe Ibarra supplied JARRELL with fentanyl and JARRELL fled from law enforcement because he knew he was in possession of illegal drugs.

On June 20, 2026, around 11:10 p.m., investigators again used a drone to observe Ibarra. This time Ibarra met with PRICE at a Jack in the Box in Lakeside, California. Ibarra drove into the parking lot, PRICE got into Ibarra's Ford Ranger for a few minutes, PRICE exited the car, and Ibarra drove away. Drone footage showed that, after Ibarra drove away, PRICE met with a man wearing a motorcycle helmet, riding on a scooter, whom investigators believed to be JARRELL.

Investigators saw Ibarra meet with PRICE again on June 24, 2026, this time at Roberto's taco shop, the same place where Ibarra had met with JARRELL on June 17, 2026.

On July 6, 2026, at approximately 8:47 p.m., JARRELL texted [redacted] "Is she there?" which I believe was a reference to Ibarra. From approximately 8:56 p.m. to 9:04 p.m., investigators saw the GPS on Ibarra's Civic was at Roberto's taco shop in Lakeside. Investigators drove to Roberto's and, around 9:00 p.m., saw PRICE walk to Ibarra's Honda Civic, enter the front passenger seat, remain inside for about three minutes, and get out of the car. As Ibarra drove away, investigators saw JARRELL, who was on his scooter, waving to her. JARRELL and PRICE then met and sat at a table outside. About 15 minutes later, around 9:16 p.m., a San Diego Sheriff's Deputy walked up to JARRELL and PRICE and saw that PRICE had a backpack next to her. A Deputy had his drug-sniffing dog sniff PRICE's backpack and the dog alerted. The Deputy then searched PRICE's backpack and found a container and two baggies which contained about 11.44 grams of fentanyl and 7.14 grams of methamphetamine. I believe based on my training, experience, and knowledge of this investigation, PRICE had received the fentanyl from Ibarra.

Between August 2, 2026, and August 6, 2026, JARRELL repeatedly messaged with [redacted] to see if he could obtain drugs, but [redacted] repeatedly told JARRELL that he did not have any to give him. For example, on August 2, 2026, [redacted] texted JARRELL, "Hey buddy, sorry—she doesn't have anything yet. We'll be ready in a few more days; she forgot to tell me yesterday." JARRELL responded, "My phone is better texting right now . . . oh ok no problem.

A few days is ok then." On August 4, 2026, JARRELL asked, "How's it going amigo" to which [redacted] replied, "Well, I'm not ready yet." Two days later, on August 6, 2026, JARRELL texted [redacted], "What's it looking like amigo?," "We've been out for 2 days now . . .", and "Please tell me the good news."

Based on my training and experience, and knowledge of this investigation, I believe when JARRELL said, "We," he's referring to himself and PRICE. When JARRELL said, "We've been out," I believe he was referring to being out of fentanyl. Based on the frequency and urgency of the messages, I believe JARRELL and PRICE intended to distribute the fentanyl they obtained from [redacted] and Ibarra to others.

Moreover, one of the drug ledgers found in Ibarra's residence appears to show that she provided several ounces of fentanyl to "Jeremy" in June. For example, the ledger showed the following:

| | | | |
|---|---|---|---|
| June 15 | Jeremy | 1 | $500 |
| June 17 | Jeremy | ½ | $350 |
| June 20 | Jeremy | 1 | $550 |

Based on the communications between [redacted] and JARRELL on June 17, and the fact that Ibarra met with JARRELL on June 17 for a short time consistent with a hand-to-hand transaction, I believe the "Jeremy" referenced in the drug ledgers is Jeremy JARRELL. Moreover, I believe the amounts in the middle column are ounces of fentanyl and the prices in the far right column are prices for fentanyl because (i) investigators seized several half-ounce and ounce quantities of fentanyl from Ibarra's customers and (ii) the prices are consistent with prices for those quantities of fentanyl (for example, $500 is a common price for an ounce of fentanyl and $350 a common price for a half-ounce of fentanyl).

Ibarra's ledger also showed that she had delivered several ounces of fentanyl to JARRELL throughout the month of July. In July, the ledgers showed a customer named "Cosmo" to whom Ibarra provided quantities of fentanyl nine times. The most recent order was for "1"—which investigators believe was one ounce of fentanyl—for $600. When investigators searched Ibarra's phone after her arrest, they found a contact saved as "Cosmo."

The phone number for this contact was the 4561 number, subscribed to JARRELL. Additionally, Ibarra's phone contained messages with [redacted] in which Ibarra referenced either "Cosmo" or "the Cosmos," which I believe to be references to either JARRELL ("Cosmo") or JARRELL and PRICE ("the Cosmos"). I believe JARRELL and PRICE were working together to obtain fentanyl. I believe JARRELL would communicate with [redacted] and both JARRELL and PRICE would meet up with Ibarra to buy the fentanyl for further distribution.

**Defendant 13 - Stan SZUMILAS**

During the investigation, agents identified Stan SZUMILAS as a subdistributor for [redacted] fentanyl trafficking organization. Below is a summary of some of the evidence implicating SZUMILAS.

From June 22, 2026, to August 23, 2026, investigators intercepted multiple communications between [redacted] and the phone number 619-729-4919 (the 4919 number), subscribed to and believed to be used by SZUMILAS.

Ibarra's phone contained a voice message from Ibarra to [redacted] asking for "Stan's" address on June 5, 2026. That same day, [redacted] sent Ibarra "951 N 3rd St," which is SZUMILAS' known address. Moreover, the GPS tracker on Ibarra's Honda Civic showed that it traveled to 951 N 3rd Street on June 5, 2026. That same day, investigators observed a man they believed was SZUMILAS meet with Ibarra at that address.

On July 8, 2026, at approximately 10:47 p.m., [redacted] called SZUMILAS and asked if SZUMILAS could "do it tomorrow morning" because [redacted] claimed, "she's not comfortable going out at night." They arranged for SZUMILAS to meet "her" around 11:00 a.m. and confirmed the order as "half and half." As discussed above herein, I believe "her" to refer be referring to Ibarra. The following day, on July 9, 2026, at 2:07 p.m., investigators watched as the GPS on Ibarra's Ford Ranger traveled to SZUMILAS' home address at 951 N 3rd St, El Cajon, California. Investigators deployed a drone and used it to watch SZUMILAS exit his home, enter Ibarra's Ford Ranger, remain for about a minute, then exit the car and go back into his residence. Based on my training, experience, and knowledge of this investigation, I believe [redacted] and SZUMILAS arranged for SZUMILAS to obtain one ounce of fentanyl from

Ibarra—half an ounce of one type of fentanyl and half an ounce of another type of fentanyl—and that Ibarra delivered the ounce of fentanyl to SZUMILAS.

Ibarra's drug ledgers showed multiple drug deliveries to "Stan" or "Estan," whom investigators believe to be SZUMILAS because (i) the ledger contains an entry showing that "Stan" received "1" ounce of fentanyl on July 9, 2026, which is the same day investigators intercepted communications between SZUMILAS and [redacted] setting up the deal for "half and half" (or one ounce) and investigators saw Ibarra travel to SZUMILAS' house, and (ii) [redacted] and Ibarra referred to SZUMILAS as "Stan" or "Estan" in communications between themselves.

The ledger also showed that, on July 16, 2026, "Estan" had bought "2" ounces of fentanyl for "$1200." Moreover, the ledger stated that on July 30, 2026, "Stan" bought "2" ounces of fentanyl for "$1,200." Likewise, in the ledger, on June 15, 2026, "Stan" had bought a "1/2" ounce of fentanyl for "$300." On June 22, 2026, "Stan" bought "1" ounce of fentanyl for "$600," and on June 30, 2026, "Stan" bought "1" ounce of fentanyl for "$600." I believe "Stan" is SZUMILAS and that he was ordering fentanyl to distribute to others. Because SZUMILAS is buying multiple-ounce quantities of fentanyl multiple times per month, I believe he is distributing that fentanyl to others.

**Defendant 14 - Christopher CURLL**

During the investigation, agents identified Christopher CURLL as a subdistributor for [redacted] fentanyl trafficking organization. Below is a summary of some of the evidence implicating CURLL.

From June 5, 2026, to August 10, 2026, investigators intercepted multiple communications between [redacted] and phone number 619-827-7267 (the 7267 number), subscribed to and believed to be used by Christopher CURLL.

On June 24, 2026, [redacted] called CURLL and stated, "you need today half?" to which CURLL replied, "Oh yes, I need. . . Yes, I'm ready." Later that day, around 10:34 p.m., [redacted] called CURLL again and asked if he was ready. CURLL confirmed he was ready and that he would be at Trader Joe's. [redacted] stated, "maybe in 10 minutes." At around 10:44 p.m., about

10 minutes stated, "I'm here in a blue Honda," which, again, investigators believed meant Ibarra was there in the Honda Civic. About four minutes later, investigators saw Ibarra's Honda Civic parked near CURLL's RV near the Trader Joe's at 1072 Camino Del Rio N, San Diego. Investigators saw CURLL walking away from Ibarra's Honda Civic. Based on my training, experience, and knowledge of this case, I believe CURLL obtained a half ounce of fentanyl from Ibarra, arranged by [redacted].

The ledgers indicate that an individual named "Cris" purchased a half ounce of fentanyl eight times between June 15, 2026, and June 26, 2026. There is an entry for "Cris" buying "1/2" ounce of fentanyl for "$280" on June 24, 2026, which is the same day investigators intercepted communications between [redacted] and CURLL arranging for [redacted] to provide CURLL with "half" and the same day investigators saw CURLL walking away from Ibarra's vehicle. Therefore, I believe the "Cris" referenced in the ledgers is CURLL.

The ledger also showed that "Cris" purchased fentanyl on three consecutive days. On July 15, 2026, "Cris" purchased "1/2" ounce of fentanyl for $580, on July 16, 2026, "Cris" purchased "1/2" ounce of fentanyl for "$315," and on July 17, 2026, "Cris" purchased "1/2" ounce of fentanyl for "$380." Three days later, on July 20, 2026, Cris purchased another "1/2" ounce for "$300."

Based on my training, experience, and knowledge of this investigation, I believe the amount of fentanyl Ibarra was supplying to CURLL was consistent with further distribution.

**Defendant 15 - [redacted]**

During the investigation, agents identified [redacted] as a subdistributor for [redacted] fentanyl trafficking organization. Below is a summary of some of the evidence implicating [redacted].

From June 12, 2026, to August 1, 2026, investigators intercepted several communications between [redacted] and phone number 619-674-8169 (the 8169 number), which is believed to be used by [redacted] because she told police that was her phone number during a stop by law enforcement on July 1, 2026. Investigators also observed [redacted] meeting with Ibarra multiple times after these set up calls with [redacted].

For example, on June 27, 2026, at approximately 3:01 p.m., [redacted] called [redacted] and asked, "are you ready now?" to which [redacted] replied, "Yeah." [redacted] asked, "you need half, right?" and [redacted] again confirmed, "Yes." At approximately 4:33 p.m., the GPS tracker on Ibarra's Honda Civic showed that the Honda Civic went to an alley near 3957 Third Ave, San Diego. Investigators have observed [redacted] meet with Ibarra multiple times in this same location. At approximately 4:41 p.m., Ibarra drove away and an investigator saw [redacted] riding a bicycle away from where Ibarra's Honda Civic was located. Based on my training, experience, and knowledge of this case, I believe Ibarra delivered a half ounce of fentanyl to [redacted].

Four days later, on July 1, 2026, around 9:08 p.m., [redacted] called [redacted] and told her "it" was "here." [redacted] said she would be there in five minutes. Around 9:31 p.m., investigators observed Ibarra's Honda Civic travel to an alley near 3957 Third Ave, San Diego. An investigator observed [redacted] meet with Ibarra's Honda Civic and conduct what appeared to be a hand-to-hand transaction through the driver's door window. Investigators observed [redacted] manipulate her backpack, place the backpack on her back, and ride her bicycle southbound in the alley and walk into the Walgreens. At approximately 10:03 p.m., a San Diego Sheriff's Deputy stopped [redacted] after she exited the Walgreens. [redacted] provided her identity and stated the 8169 number was her phone number. The Deputy asked for consent to search her backpack, [redacted] did not provide consent, and the Deputy did not search it.

Ibarra's drug ledgers show nine entries for an individual named [redacted] in July. Each of these deliveries was for either "1" ounce of fentanyl or "1/2" an ounce of fentanyl. I believe the [redacted] referenced in the drug ledgers is [redacted] because (i) [redacted] first name is [redacted] and "[redacted]" appears to be a shortened version of [redacted], and (ii) Ibarra's phone had a message from [redacted] on March 14, 2026, stating "Naty 1/2" and then also providing the address [redacted], San Diego, which is the same location where investigators saw [redacted] multiple times throughout the investigation.

Ibarra's ledgers also show 10 entries for [redacted] between July 15 and July 30, 2026, where [redacted] orders at least a "1/2" ounce of fentanyl in every transaction ranging from $185 to $300. Based on my training, experience, and knowledge of this investigation, I believe the amount of fentanyl Ibarra was supplying to [redacted], and the frequency of the purchases was consistent with further distribution.

**REQUEST FOR SEALING**

It is further respectfully requested that this Court issue an Order sealing, until further order of this Court, all papers submitted in support of this complaint, including the complaint, probable cause statement and arrest warrants. Sealing is necessary because premature disclosure of the contents of this probable cause statement and related documents may cause the defendants to flee and may cause destruction of evidence and may have a negative impact on this continuing investigation.